AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA Glenn-Applegate

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched or identify the person by name and address)* <br><br> Certain cellular phones seized during the arrest of Eric Ahiekpor on June 24, 2020 | )<br>)<br>)  Case No.  2:20-mj-446<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 18 USC 1956 | Money Laundering | |
| 18 USC 1957 | Money Laundering | |
| 18 USC 1343 | Wire Fraud | |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shawn Mincks, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____June 25, 2020_____

City and state: _____Columbus, OH_____

Kimberly A. Jolson
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

IN THE MATTER OF
THE SEARCH OF:

NO. <u>2:20-mj-446</u>

<u>Certain cellular phones seized
during the arrest of Eric Ahiekpor
on June 24, 2020</u>

## ATTACHMENT A:  LOCATION TO BE SEARCHED

Two cellular phones seized by the United States Marshal's Service when Eric Ahiekpor was arrested on June 24, 2020.  The two cellular phones are further described as follows:

    a.  Blue Android cellular phone
    b.  Rose Gold iPhone cellular phone

1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN THE MATTER OF
THE SEARCH OF:

NO. 2:20-mj-446

Certain cellular phones seized
during the arrest of Eric Ahiekpor
on June 24, 2020

**ATTACHMENT B: ITEMS TO BE SEIZED**

Information to be seized by the government:

1.  All information that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud); any section of 18 U.S.C. § 1956 (money laundering) and/or 18 U.S.C. § 1957 (money laundering), regardless of the format in which they are or may be stored, for the period August 1, 2015 to the present, including:

    a.  Evidence of user attribution showing who used or owned computers, cell phones, and electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    b.  Records identifying the establishment, ownership, operation and/or control of any limited liability corporation or other business entity including articles of organization; correspondence with and/or submissions to/from any Secretary of State office; applications, disposition records and/or correspondence related to the issuance or use of Employer Identification Numbers (EIN); minutes and other official business records; and documents identifying any registered agent(s), incorporator(s), and/or other identified members;

    c.  All records related to offered or actual purchase, sale, transfer or shipment of motor vehicles or other consumer goods including sale advertisements or listings, correspondence, purchase orders, contracts, invoices, receipts, vehicle registrations, titles, shipping records, and delivery notices;

    d.  All records related to or referencing electronic transfers of funds or cash deposits including requests for an electronic transfer or cash deposit, wiring or deposit instructions, receipts, and correspondence;

    e.  All records related or referring to persons or entities in other countries and the locations of such persons entities;

1

f.  Asset ownership and/or acquisition records including contracts, invoices, receipts, registrations, titles insurance records and/or photographs of assets including motor vehicles, real property, boats, jewelry, precious metals and gems, and currency (foreign, domestic, or virtual currency);

g.  Travel records including travel directions, hotel reservations, rental car reservations, airplane reservations, invoices, airline tickets, and itineraries;

h.  Records related to banking activity including communications and data related to the opening, closing, use, custody and/or control of bank accounts, alternative currency accounts (i.e. those related to Bitcoins), credit cards, and/or debit cards including applications for accounts; approval or declination notices; credit and/or debit card issuance notices; credit and/or debit card activations; bank statements; welcome or account opening/closing notifications; deposit, payment, withdrawal, or transfer orders; receipts and/or notifications; balance inquiries and/or notices; and security notifications;

i.  All financial statements, accounting records and supporting source documents relating to receipts, expenditures, general ledgers, accounts and notes receivable, accounts and notes payable, balance sheets, income statements, statements of profit and loss, and any other accounting records and other records and/or ledgers relating to Brightstar Automotive; Ingwet Canal, Premier Choice Home Health or any variation of these entity names or any other entities identified through items seized pursuant to section b. above;

j.  Records pertaining to any financial institution account including but not limited to account numbers, passwords, personal identification numbers (PINS), deposit/withdrawal records, notes, logs, and photographs;

k.  Electronic records of internet sites visited and data accessed and/or communications made in the course of visiting such internet sites;

l.  Communications records and histories made through and/or from applications (known as "Apps"); emails; texts; calls or other media contained on the electronic devices to be searched and all attachments included in such communications; and

m. Contact lists and any documents reflecting names, addresses, email addresses, telephone numbers, fax numbers and/or other contact information.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

### AFFIDAVIT
IN SUPPORT OF SEARCH WARRANTS

I, Shawn Mincks, Special Agent, U.S. Department of the Treasury, Internal Revenue Service, Criminal Investigation, being duly sworn, depose and say that:

### Introduction and Purpose

1. I am a Special Agent with IRS-Criminal Investigation and have been so employed since 2008. I have received specialized law enforcement training at the Federal Law Enforcement Training Center, Glynco, Georgia and additional specialized training from the IRS. My duties as a Special Agent include conducting investigations of individuals and businesses that have violated Federal Law, particularly those laws found under Title 18, Title 26 and Title 31 of the United States Code. I have participated in multiple such investigations, including several investigations related to individuals who launder funds derived from romance and other international fraud schemes.

2. I am assigned to pursue a federal criminal investigation of Eric Ahiekpor, Robert Asante, Kwame Yeboah and other co-conspirators. I make this affidavit in support of a search warrant for the following cellular phones seized by the U.S. Marshal's Service during the arrest of Ahiekpor on June 24, 2020. These items are further described as the following and is also described in Attachment A:

Attachment A

    a. Blue Android cell phone
    b. Rose Gold iPhone cell phone

These devices are currently in the possession of the United States Marshal's Service 85 Marconi Boulevard, Room # 460, Columbus, OH 43215.

3. The information in this affidavit is either personally known to me based upon my experience, investigative activities, analysis of records and interviews; or it has been relayed to me by other agents and/or law enforcement personnel. This affidavit is being submitted for the limited purpose of securing a search warrant, and I have not included each and every fact know to me concerning the investigation. I have set forth only the facts I believe are necessary to support the requested search warrant.

1

4. I contend there is probable cause to believe that Ahiekpor, Asante and Yeboah were engaged, together and with others, in a conspiracy to commit money laundering in violation of 18 USC 1956(h). Additionally, I contend that Ahiekpor, Asante and Yeboah each personally committed multiple acts in violation of 18 USC 1956(a)(1)(B)(i); 18 USC 1956(a)(2)(B)(i); and/or 18 USC 1957, and that evidence of such violations and evidence of wire fraud in violation of 18 USC 1343 is located on or in the item described in paragraph #2 and in Attachment A.

### Evidence in Support of Probable Cause

5. On June 17, 2020, your affiant informed Mark Stroh with the United States Marshal's Service that the government intended to seek an indictment against Ahiekpor on June 23, 2020. Your affiant further informed Stroh that he was interested in applying for search warrants for any phones in Ahiekpor's possession when he was arrested and asked Stroh to inform him if any were obtained.

6. Over the past two years, your affiant has had more than one discussion with Stroh regarding the nature of the activity for which the government was to seek indictment of Ahiekpor. Your affiant and Stroh have discussed the activity in relation Ahiekpor specifically as well as in relation to others who have previously been indicted for engaging in similar activity. During these discussions, your affiant has discussed with Stroh the use of cell phones in furtherance of the activity.

7. On June 23, 2020, Ahiekpor was indicted and charged with one count of money laundering conspiracy in violation of 18 USC 1956(h). On June 24, 2020 at approximately 8:00AM, the United States Marshals Service knocked and announced their presence at the front door of 1324 Cottonwood Drive, Lewis Center, OH, Ahiekpor's last known residence. Nobody answered the door. The United States Marshal's Service maintained surveillance on the house and attempted to establish probable cause that Ahiekpor was inside the residence. When satisfied that probable cause had been obtained, at approximately 1:15PM the United States Marshal's Service knocked and announced their presence again at the front door of 1324 Cottonwood Drive, Lewis Center, OH. When nobody answered, the United States Marshal's Service breached the door and made entry. As they were clearing the first floor, an individual later determined to be Ahiekpor announced from an upper level that he was upstairs. When the United States Marshal's Service encountered Ahiekpor, he was talking on the phone. Ahiekpor stated that the person to whom he was speaking was his attorney. While clearing the house, the United States Marshal's Service also saw another phone. In order to preserve evidence on the phones, the United States Marshal's Service seized both phones pending application of a search warrant by your affiant.

8. Through interviews and analysis of bank records and other documentation, the affiant believes the investigation to date tends to show that Ahiekpor, Asante, Yeboah and others, both known and unknown, have been engaged in a conspiracy to commit money laundering in that they have knowingly and willfully facilitated the receipt, concealment and transfer of funds derived from so-called "Romance Scam" victims.

9. Perpetrators of the scams post fake profiles on various dating websites, then individuals throughout the United States and other countries are contacted by or enticed to initiate contact with the perpetrators. After contacting the victims online, the perpetrators use email, instant messaging services, text messaging and phone calls to build a relationship of trust with the victims. Once trust is gained, the perpetrators convince the victims to provide money purportedly for various investments or need-based reasons. The perpetrators tell many of the victims that they are overseas. The perpetrators further explain, for example, that they have located a gold or diamond mine through which they can both become very wealthy if the victim invests money; have had financial trouble and need assistance; or have had legal trouble, are in prison and need money to pay off the captors. The victims then wire transfer, direct transfer or deposit money into bank accounts located within the United States and controlled by Ahiekpor, Asante, Yeboah and/or other co-conspirators. Evidence indicates that many of these bank accounts were opened in the names of business entities controlled by the co-conspirators. The victims provide the funds with the expectation that the money will be invested or used to assist their online "friend."

10. Contemporaneous and subsequent to the wire transfers, account transfers and deposits received by the co-conspirators from the victims, the co-conspirators dispose of the funds through cash withdrawals; checks issued to parties known to the co-conspirators; transfers to each other, as well as others not named in this affidavit; international and domestic wire transfers; personal expenditures; and purchases of official checks. None of the victims receive any return on their "investments" or any of their money back. The loss to all victims exceeds $7 million.

11. The affiant believes that evidence garnered so far in the investigation tends to show that the recipients of the funds, specifically Ahiekpor, Asante and Yeboah, knew that the funds they were receiving were derived from some kind of unlawful activity, and the funds were, in fact, derived from a specified unlawful activity, namely wire fraud (18 USC 1343). From the recipient bank accounts, the funds were not used in the manner promised to the victims of the fraud. Instead, the funds were transacted in a fashion designed to conceal the nature, source, location, ownership and control of the funds through cash withdrawals and other mechanisms, in violation of 18 USC 1956 (a)(1)(B)(i). Some of the transactions designed to conceal the nature, source, location,

3

ownership and control of the funds were conducted internationally, in violation of 18 USC 1956 (a)(2)(B)(i). Additionally, many debits were in excess of $10,000, in violation of 18 USC 1957. Since they were working in concert with each other, as well as the perpetrators of the Romance Scams, the activity was in violation of 18 USC 1956(h).

## Relevant Bank Accounts, Entities and Phone Numbers

12. According to bank records, Asante opened and controlled the following bank accounts, among others, in his own name and on which he was the sole signer:

       a. July 30, 2014 – August 1, 2017 - PNC Bank account # xx7452 (PNC 7452).

       b. December 23, 2014 – October 10, 2017 - Bank of America account # xx9127 (BOA 9127).

       c. September 9, 2015 – June 16, 2017 – JP Morgan Chase Bank account # xx3358 (JPMC 3358).

13. According to bank records, Asante's wife, Nancy Asante (Nancy), also opened and controlled an account of interest, on which she was the sole signer:

       a. June 20, 2014 – May 6, 2016 – Bank of America account # xx2027 (BOA 2027).

14. According to records from the Ohio Secretary of State, Asante established Ingwet Canal LLC (Ingwet) on March 2, 2017 by filing Articles of Organization with the State of Ohio. According to bank records, he opened and controlled the following bank accounts in the name of Ingwet and on which he was the sole signer:

       a. March 9, 2017 – November 30, 2017 – JP Morgan Chase Bank account # xx1215 (JPMC 1215).

       b. September 14, 2018 – March 31, 2019 – TD Bank account # xx9310 (TD 9310).

15. According to records from the Ohio Secretary of State, Yeboah established Brightstar Automotive (Brightstar) on May 5, 2015 by filing Articles of Organization with the State of Ohio. According to bank records, he opened and controlled the following bank accounts in the name of Brightstar and on which he was the sole signer:

4

    a.  June 2, 2017 – February 2, 2018 – JP Morgan Chase Bank account # xx2366 (JPMC 2366).

    b.  December 18, 2017 – October 31, 2018 – Bank of America account # xx0009 (BOA 0009).

    c.  October 5, 2018 – at least August 31, 2019 – US Bank account # xx3133 (US 3133).

    d.  April 9, 2019 – at least August 31, 2019 – PNC Bank account # xx0518 (PNC 0518).

16. Ahiekpor opened and controlled the following accounts in his own name:

    a.  January 8, 2018 – August 5, 2019 – Fifth Third Bank account # xx0080 (FTB 0080).

        i.  When Ahiekpor opened the account, he listed his phone number as 419-944-9903.

17. Ahiekpor established Premier Choice Home Health (PCHH) on February 4, 2011 by filing Articles of Organization with the State of Ohio. Ahiekpor opened and controlled the following bank accounts in the name of PCHH:

    a.  February 4, 2011 – October 12, 2018 – JP Morgan Chase Bank account # xx5162 (JPMC 5162).

    b.  June 28, 2018 – September 27, 2018 – Wells Fargo Bank account # xx2902 (WF 2902).

    c.  September 5, 2018 – April 30, 2019 – Bank of America account # xx4519 (BOA 4519).

    d.  October 4, 2018 – November 9, 2018 – PNC Bank account # xx1076 (PNC 1076).

    e.  November 27, 2018 – May 29, 2019 – Fifth Third Bank account # xx8425 (FTB 8425).

    f.  March 14, 2019 – August 30, 2019 – Huntington National Bank account # xx2326 (HNB 2326).

18. Asante and Yeboah established Twist Lounge & Grill (Twist) on May 26, 2016 by filing Articles of Organization with the State of Ohio. Asante, Yeboah and Ahiekpor subsequently opened various bank accounts in the name of Twist, including the following:

      a. June 8, 2016 – February 7, 2019 – Ahiekpor, Asante and Yeboah Ahiekpor opened and controlled JP Morgan Chase Bank account # xx7116 (JPMC 7116).

      b. October 16, 2017 – March 29, 2019 – Asante and Yeboah opened and controlled JP Morgan Chase Bank account # xx5930 (JPMC 5930).

      c. October 5, 2018 – August 31, 2019 – Yeboah opened and controlled US Bank account # xx3125 (US 3125).

      d. October 10, 2018 – February 1, 2019 – Yeboah opened and controlled Bank of America account # xx7060 (BOA 7060).

19. Western Union records were analyzed. They show that Ahiekpor sent funds to Ghana several times between at least July of 2014 and March of 2019. When sending the funds, Ahiekpor listed his phone number as 419-944-9903.

**Witness Statements and Transactions**

20. According to an interview with Person 10, whose identity is known to your Affiant, Person 10 met somebody she believed to be named Nicholas Carl Hoffman on an online dating website in 2014. Hoffman convinced Person 10 that he was a middleman who facilitated international shipments, and he needed Person 10 to provide money to him for shipping fees, storage fees and taxes. Bank records show that, between December 4, 2014 and December 19, 2014, Person 10 deposited $110,000 in cash into BOA 2027, controlled by Asante and/or his wife. Person 10 expected to be repaid, but she never received any of her money back.

      a. Bank records show that, after receiving the funds, Asante and/or his wife engaged in numerous transactions designed to conceal the nature, source, location, and control of the funds. The transactions included, but were not limited to, issuances of checks payable to Asante totaling $68,800. Many of the checks contained memoranda reading "Car Payment."

6

      i. Bank records show that, of the checks issued to him, Asante deposited $17,300 into PNC 7452, controlled by Asante, where a large portion of the funds was used on personal expenditures. Asante deposited the remaining funds into a Huntington Bank account he controlled. From there, Asante sent an additional $12,000 to various individuals in Ghana. He also withdrew cash or purchased official checks totaling over $30,000.

21. Bank records show that, between January 13, 2015 and August 31, 2015, Person 10 also deposited $106,000 in cash into BOA 9127 and wired $30,500 into BOA 9127, controlled by Asante.

    a. Bank records show that, after receiving the funds from Person 10 into BOA 9127, and on or about the dates set forth below, Asante engaged in the following financial transactions, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

        i. April 22, 2015 - $8,000 online banking transfer to a third party;

        ii. May 12, 2015 - $10,000 online banking transfer to a third party;

        iii. May 13, 2015 - $4,000 online banking transfer to a third party.

    b. Bank records and MoneyGram records show that, after receiving the funds from Person 10 into BOA 9127, Asante transmitted funds, derived from wire fraud, from the United States to a place outside the United States and such transactions were designed to conceal the nature, source, location, ownership and control of the funds. The transactions included the following:

        i. April 22, 2015 - $1,122 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,100 to Ghana plus fees;

        ii. May 11, 2015 - $965.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $950 to Ghana plus fees;

        iii. May 16, 2015 - $509.90 transaction at Wal-Mart which consisted of a MoneyGram transfer of $500 to Ghana plus fees;

        iv. May 20, 2015 - $965.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $950 to Ghana plus fees;

v. June 9, 2015 - $1,224 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,200 to Ghana plus fees;

vi. June 9, 2015 - $1,015.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,000 to Ghana plus fees;

vii. June 25, 2015 - $$965.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $950 to Ghana plus fees;

viii. June 30, 2015 - $1,015.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,000 to Ghana plus fees;

ix. June 30, 2015 - $1,015.50 transaction at Wal-Mart which consisted of a second MoneyGram transfer of $1,000 to Ghana plus fees;

x. July 2, 2015 - $1,015.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,000 to Ghana plus fees;

xi. July 3, 2015 - $1,015.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,000 to Ghana plus fees;

xii. July 22, 2015 - $1,122 transaction at Wal-Mart which consisted of a MoneyGram transfer of $1,100 to Ghana plus fees;

xiii. July 28, 2015 - $615.50 transaction at Wal-Mart which consisted of a MoneyGram transfer of $600 to Ghana plus fees;

xiv. July 28, 2015 - $615.50 transaction at Wal-Mart which consisted of a second MoneyGram transfer of $600 to Ghana plus fees.

22. According to an interview with Person 11, whose identity is known to your Affiant, Person 11 met somebody she believed to be named Michael Gresham on an online dating website in February of 2017. Gresham told Person 11 that he was a retired Colonel and owned a business that dealt in diamonds and gold. Gresham also introduced Person 11 to Asante, with whom she communicated directly. Over time, Gresham and Asante instructed Person 11 to send money to various individuals for myriad reasons, including expenses involving a camera and a shipment of gold. Person 11 eventually discovered that the profile set up by Gresham was fake, and she had been scammed. Bank records show that, between February 21, 2017 and August 14, 2017, Person 11 deposited $68,500 in cash into BOA 9127, controlled by Asante.

a. Bank records show that, after receiving the funds from Person 11 into BOA 9127, and on or about the dates set forth below, Asante engaged in the following financial transactions, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

  i. February 21, 2017 - $1,003 ATM cash withdrawal consisting of $1,000 cash plus a $3.00 fee;

  ii. March 9, 2017 - $505.50 ATM cash withdrawal consisting of $500 cash plus a $5.50 fee.

23. According to an interview with Person 12, whose identity is known to your Affiant, Person 12 is a 73-year old widow who met numerous individuals online. These individuals included somebody she believed was serving in the military in the United Kingdom; somebody named Felix Dante Okoro from Ghana; and somebody she believed to be named General Stephen Townsend. Person 12 sent "hundreds of thousands of dollars" to various people at the instruction of Okoro and Townsend. An "unknown banker" instructed Person 12 to send money to Asante. Bank records show that, between July 6, 2017 and July 13, 2017, Person 12 wired $160,778 to BOA 9127, controlled by Asante.

a. Bank records show that, after receiving the funds from Person 12 into BOA 9127 and on or about the dates set forth below, Asante engaged in the following monetary transactions in criminally derived property of a value greater than $10,000:

  i. July 11, 2017 - $28,600 wire to Company 12 in Ghana;

  ii. July 14, 2017 - $49,850 wire to Company 12 in Ghana.

24. Bank records show that, on April 13, 2017, Person 12 wired $33,899 to JPMC 1215, controlled by Asante. The memorandum on the wire read "Goods."

a. Bank records show that, after receiving the funds from Person 12 into JPMC 1215 and on or about the date set forth below, Asante engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

  i. April 14, 2017 - $25,250 wire to Company 6 in Ghana.

25. According to an interview with Person 4, whose identity is known to your Affiant, Person 4 met somebody she believed to be named Scott Bradley Hopkins on an online dating website. Hopkins told Person 4 that he needed to transport a package containing a large amount of money and jewelry to the United States. Person 4 sent approximately $300,000 to various individuals via MoneyGram, Western Union and bank wires, including somebody she believed was a military general in Ghana. She believed the funds were to be used to facilitate transport of the package. Bank records show that these funds included a wire to JPMC 1215, controlled by Asante, in the amount of $25,000 on September 26, 2017.

   a. Bank records show that, after receiving the funds from Person 4 into JPMC 1215, Asante engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

      i. September 26, 2017 - $20,000 wire to a company in Illinois.

26. According to an interview with Person 13, whose identity is known to your Affiant, Person 13 met somebody she believed to be named Matt Dickson on an online dating website in 2016. Dickson told Person 13 that he was a geologist who did excavation work. Dickson told Person 13 that his partner was Asante. Dickson eventually convinced Person 13 to send money to various people, including Asante. The money was supposed to be invested and used to pay for shipping fees. Person 13 was supposed to have been repaid at a rate of 10%. Bank records show that, on September 22, 2016 and September 23, 2016, Person 13 wired $25,000 and $4,000, respectively, to PNC 7452, controlled by Asante. Person 13 never received any money back.

   a. Bank records show that, after receiving the funds from Person 13 into PNC 7452 and on or about the date set forth below, Asante engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

      i. September 26, 2016 - $20,000 wire to an individual in Ghana.

27. Bank records show that, between January 17, 2017 and May 22, 2017, Person 13 provided an additional $148,500 to Asante, all of which was deposited into JPMC 3358, controlled by Asante.

   a. Bank records show that, after receiving the additional funds from Person 13 into JPMC 3358, Asante transmitted or caused to be transmitted funds, derived from wire fraud, from the United States to a place outside the United States and such transactions were designed to conceal the nature,

10

source, location, and control of the funds. The transactions included the following:

i. January 15, 2017 – $241.78 cash withdrawal at an ATM located in Accra, Ghana;

ii. January 18, 2017 - $482.43 cash withdrawal at an ATM located in Accra, Ghana;

iii. January 18, 2017 – a second $482.43 cash withdrawal at an ATM located in Accra, Ghana;

iv. January 19, 2017 – $479.40 cash withdrawal at an ATM located in Accra, Ghana;

v. January 19, 2017 – a second $479.40 cash withdrawal at an ATM located in Accra, Ghana;

vi. January 20, 2017 - $477.41 cash withdrawal at an ATM located in Accra, Ghana;

vii. January 20, 2017 - $474.11 cash withdrawal at an ATM located in Kumasi, Ghana;

viii. January 21, 2017 - $474.11 cash withdrawal at an ATM located in Kumasi, Ghana;

ix. January 21, 2017 – a second $474.11 cash withdrawal at an ATM located in Kumasi, Ghana;

x. January 22, 2017 – $474.11 cash withdrawal at an ATM located in Kumasi, Ghana;

xi. January 23, 2017 - $474.11 cash withdrawal at an ATM located in Kumasi, Ghana;

xii. January 26, 2017 - $475.75 cash withdrawal at an ATM located in Kumasi, Ghana;

xiii. January 30, 2017 - $476.85 cash withdrawal at an ATM located in Kumasi, Ghana;

xiv. February 1, 2017 - $471.94 cash withdrawal at an ATM located in Kumasi, Ghana;

xv. February 2, 2017 - $471.40 cash withdrawal at an ATM located in Santasi, Ghana;

xvi. February 2, 2017 – a second $471.40 cash withdrawal at an ATM located in Santasi, Ghana;

xvii. February 3, 2017 - $470.32 cash withdrawal at an ATM located in Santasi, Ghana;

xviii. February 3, 2017 – a second $470.32 cash withdrawal at an ATM located in Santasi, Ghana;

xix. February 4, 2017 - $469.25 cash withdrawal at an ATM located in Accra, Ghana;

xx. February 4, 2017 – a second $469.25 cash withdrawal at an ATM located in Accra, Ghana;

xxi. February 5, 2017 - $469.25 cash withdrawal at an ATM located in Accra, Ghana;

xxii. February 6, 2017 - $469.25 cash withdrawal at an ATM located in Accra, Ghana;

xxiii. February 6, 2017 – a second $469.25 cash withdrawal at an ATM located in Accra, Ghana.

b. Bank records show that, using funds received into JPMC 3358 from Person 13 and on or about the dates set forth below, Asante engaged in the following financial transactions, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

i. February 9, 2017 - $7,000 cash withdrawal;

ii. February 14, 2017 - $3,000 ATM cash withdrawal;

iii. February 15, 2017 - $2,000 ATM cash withdrawal;

      iv.  February 21, 2017 - $1,000 ATM cash withdrawal;

      v.  March 2, 2017 - $2,000 ATM cash withdrawal;

      vi.  March 7, 2017 - $3,000 ATM cash withdrawal;

      vii.  March 13, 2017 - $2,000 cash withdrawal;

      viii.  March 14, 2017 - $10,000 cash withdrawal;

      ix.  March 24, 2017 - $1,000 ATM cash withdrawal.

c.  Bank records show that, after receiving the funds from Person 13 into JPMC 3358 and on or about the dates set forth below, Asante engaged in the following monetary transactions in criminally derived property of a value greater than $10,000:

      i.  February 10, 2017 - $18,000 wire to a company in Ghana;

      ii.  March 1, 2017 – Issuance of a check in the amount of $25,000 payable to Asante.

28. Further analysis of the bank records related to the accounts described herein show that additional funds characteristic of derivation from romance fraud were deposited and/or wired into the accounts controlled by Asante described above. Bank records relating to other bank accounts not described above were also analyzed. The additional bank records show that funds characteristic of derivation from romance fraud were deposited into these accounts as well. Not all the individuals from whom funds were received by Asante were interviewed. However, deposits from many of the individuals share characteristics with those deposits known to have originated from romance fraud. As such, funds characteristic of romance fraud which were deposited and/or wired into accounts controlled by Asante totaled at least $1.9 million. After the funds reached the accounts, Asante engaged in transactions to dispose of the funds similar to those transactions described above, including but not limited to the following:

a.  Bank records show that, between October 4, 2017 and October 5, 2017, $54,350.91 characteristic of romance fraud was received into JPMC 1215 from three different individuals. Bank records further show that, after receiving the funds, on or about October 6, 2017, Asante wired $33,626 to JPMC 2366 in the name of Brightstar Automotive.

29. According to an interview with Person 14, whose identity is known to your Affiant, Person 14 met somebody she believed to be named Rene Rehpenning who claimed to work on an oil rig in Qatar. Rehpenning eventually asked Person 14 to accept a box for him which contained $250 million. Rehpenning also claimed at one point that he had been arrested. Rehpenning and various other alleged individuals enticed Person 14 to send money related to the box of money, incarceration or other fictitious needs in order to pay fees, fines and expenses. Person 14 stated that she was defrauded out of $5 million over a period of one year. Bank records show that, on December 5, 2017, Person 14 wired $85,000 to JPMC 2366, controlled by Yeboah.

30. According to an interview with Person 15, whose identity is known to your Affiant, Person 15 stated that he met somebody he believed to be named Dennis Dyer on an online dating website in the fall of 2017. Dyer claimed he was in the military in Syria or Afghanistan and had amassed a significant supply of diamonds and gold. Dyer asked Person 15 for money to pay for customs and shipping fees related to shipping boxes full of these items back to the United States. Person 15 sent approximately $700,000 to various people over a two-month period at Dyer's direction. Bank records show that, on December 6, 2017, Person 15 transferred $160,000 to JPMC 2366, controlled by Yeboah. Person 15 expected to be repaid when Dyer came to the United States. Dyer never came to the United States, and Person 15 has not been repaid.

  a. Bank records show that, after receiving the funds from Person 14 and Person 15 into JPMC 2366 and on or about the dates set forth below, Yeboah engaged in the following monetary transactions in criminally derived property of a value greater than $10,000:

    i. December 6, 2017 - $50,000 wire to a bank account held in China;

    ii. December 7, 2017 - $70,000 wire to Company 4 in China;

    iii. December 7, 2017 - $30,000 wire to Company 3 in China;

    iv. December 7, 2017 - $30,000 wire to a bank account held in Hong Kong;

    v. December 7, 2017 - $20,000 wire to a company located in the United States.

31. According to an interview with the daughter of Person 6, whose identity is known to your Affiant, Person 6 has been admitted to a psychiatric ward because of scams perpetrated upon him by various individuals known to Person 6 as Jack Renteria and Diplomat Keith Harper. Person 6 lost $800,000 due to these scams. Bank records

14

show that Person 6 deposited $24,900 in cash into BOA 0009, controlled by Yeboah, on February 23, 2018.

32. According to an interview with the daughter of Person 9, whose identity is known to your Affiant, Person 9 met somebody he believed to be named Roger Snider on an online dating website in December of 2017. Snider told Person 9 that he was a soldier serving in Syria. Snider told Person 9 he had saved a woman's life, and a rich oil barren wanted to reward him by paying him $2 million in gold. Person 9 provided a total of approximately $471,000 to numerous people at Snider's direction related to a supposed package containing the $2 million in gold. Bank records show that these funds included wires totaling $58,400 to BOA 0009, controlled by Yeboah, on January 22, 2018 and January 23, 2018.

   a. Bank records show that, after receiving the funds from Person 6 and Person 9 into BOA 0009 and on or about the dates set forth below, Yeboah engaged in the following monetary transactions in criminally derived property of a value greater than $10,000:

      i. January 25, 2018 - $25,000 wire to Company 3 in China;

      ii. February 27, 2018 - $22,850 wire to Company 3 in China

   b. Bank records show that, after receiving the funds from Person 6 and Person 9 into BOA 0009 and on or about the dates set forth below, Yeboah engaged in the following financial transactions, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

      i. January 24, 2018 - transfer of $5,000 to Conspirator 8;

      ii. January 24, 2018 – transfer of $7,500 to Conspirator 7.

      iii. Wires and a check totaling $32,100 to Asante;

         1. Bank records show that Asante received the funds into a Navy Federal Credit Union account he controlled. Between January 25, 2018, when the first funds were deposited, and May 17, 2018, when most funds were depleted, Asante withdrew $5,400 in cash via ATMs in Ghana; sent over $28,000 to various individuals via Peer 2 Peer transfers; and

disposed of a significant portion through personal expenditures.

33. According to an interview with Person 16, whose identity is known to your Affiant, Person 16 stated that, after her husband died, she received an unsolicited social media message from somebody she believed to be named Ben Grayson. Grayson told Person 16 that he was in the army in Afghanistan. Eventually, Grayson asked Person 16 to send him money to pay for fees and costs associated with shipping a box from Afghanistan to the United States. Later, Grayson told Person 16 that he needed money to help pay for his transportation back to the United States. Person 16 sent money to various places at his request and expected to be repaid. Bank records show that, on May 23, 2019, Person 16 wired $18,000 to PNC 0518, controlled by Yeboah. Grayson did not travel to the United States, and a box never arrived from Afghanistan. Person 16's money has not been returned to her.

    a. Bank records show that, after receiving the funds from Person 16 into PNC 0518 and on or about the dates set forth below, Yeboah engaged in the following financial transactions, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

        i. May 24, 2019 - $8,000 cash withdrawal;

        ii. May 28, 2019 - $6,000 cash withdrawal;

34. Bank records show that Person 16 also wired $40,000 to US 3133, controlled by Yeboah, on May 15, 2019.

    a. Bank records show that, after receiving the funds from Person 16 into US 3133 and on or about the date set forth below, Yeboah engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

        i. May 21, 2019 - $41,571 withdrawal, which consisted of the purchase of seven official checks payable to automobile auction companies.

35. According to an interview with Person 23, whose identity is known to your Affiant, Person 23 met some people on a social media application. Eventually, the people convinced Person 23 to send money to them to pay for fees related to the shipment of a box of valuables into the United States. Person 23 eventually realized she was being

defrauded and reported the scam to the FBI in early 2019. Bank records show that, on November 2, 2018, Person 23 wired $90,000 to BOA 7060, controlled by Yeboah.

     a. Bank records show that, after receiving the funds from Person 23 and other funds characteristic of derivation from romance fraud and on or about the date set forth below, Yeboah engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

          i. December 20, 2018 – $59,400 wire to Robert Asante at Ecobank Ghana.

36. Further analysis of the bank records related to the accounts described herein show that additional funds characteristic of derivation from romance fraud were deposited and/or wired into the accounts controlled by Yeboah described above. Bank records relating to other bank accounts not described above were also analyzed. The additional bank records show that funds characteristic of derivation from romance fraud were deposited into these accounts as well. Not all the individuals from whom funds were received by Yeboah were interviewed. However, deposits from many of the individuals share characteristics with those deposits known to have originated from romance fraud. As such, funds characteristic of romance fraud which were deposited and/or wired into accounts controlled by Yeboah totaled at least $1.2 million. After the funds reached the accounts, Yeboah engaged in transactions to dispose of the funds similar to those transactions described above.

37. According to an interview with Person 17 whose identity is known to the affiant, Person 17 met somebody she believed to be named Arthur George on an online dating website in 2018. George and others convinced Person 17 to send money to various people for myriad reasons, including George's alleged detention. Bank records show that between May 11, 2018 and September 4, 2018, official checks purchased by Person 17 totaling $23,500 were deposited into JPMC 5162, controlled by Ahiekpor.

38. According to an interview with Person 18 whose identity is known to the affiant, Person 18 met somebody he believed to be named Ayisha Samuel on a social media application sometime in 2018. Samuel cultivated a sense of intimacy with Person 18 and convinced him that they would be married. Person 18 sent over $60,000 to various people at Samuel's request. Samuel told Person 18 that her aunt's name was Ruth Roberts, and she would facilitate the transfer of the money. The money was supposed to be used to help Samuel return to the United States. Samuel never came to the U.S., and Person 18 never received any of his money back.

39. Bank records show that between June 25, 2018 and August 29, 2018, Person 18

wired $11,291 to JPMC 5162, controlled by Ahiekpor. Memoranda on the wires included "Paying for Education, Attn: Ruth"; "Personal Medical Supplies, Attention: Ruth"; and "Medical Expense Attn: Ruth Robertson."

40. According to an interview with Person 19 whose identity is known to the affiant, Person 19 met somebody he believed to be named Vita Ofori after he received an unsolicited text message on his phone. Eventually, Ofori began to ask Person 19 for money for various reasons, including issues related to a passport and visa, shipments of gold, and acquisition of some kind of equipment. Ofori instructed Person 19 to pay intermediaries, including Premier Choice Home Health. Premier Choice Home Health was allegedly an agent for a shipping company. Person 19 mailed checks to Premier Choice Home Health. Bank records show that between June 4, 2018 and July 20, 2018, checks issued by Person 19 totaling $39,000 were deposited into JPMC 5162, controlled by Ahiekpor. Person 19 expected to be repaid, but he has not received any of his money back.

    a. Bank records show that, after receiving the funds from Person 17, Person 18 and Person 19 into JPMC 5162 and on or about the dates set forth below, Ahiekpor engaged in the following financial transactions, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

        i.   May 15, 2018 – $1,000 cash withdrawal;

        ii.   June 5, 2018 - $4,250 cash withdrawal;

        iii.   June 7, 2018 – $3,380 Zelle transfer to Conspirator 11;

        iv.   June 11, 2018 - $3,000 Zelle transfer to Conspirator 11;

        v.   June 11, 2018 – a second $3,000 Zelle transfer to Conspirator 11;

        vi.   June 11, 2018 - $1,600 Zelle transfer to Conspirator 11;

        vii.   June 12, 2018 - $4,000 Zelle transfer to Conspirator 11.

    b. Bank records also show that, after receiving the funds from Person 17, Person 18 and Person 19 into JPMC 5162 and on or about the dates set forth below, Ahiekpor engaged in the following monetary transactions in criminally derived property of a value greater than $10,000:

        i.   July 5, 2018 - $15,270 wire to a bank account located in Accra,

Ghana;

    ii. July 5, 2018 - $10,730 wire to an individual in Accra, Ghana.

41. According to an interview of Person 20 whose identity is known to the affiant, Person 20 met somebody she believed to be named James Cartwright on a social media application a few years ago. Cartwright told Person 20 that he was a general in the military and was located in Syria. Cartwright eventually began asking Person 20 for money to pay customs and shipping fees related to a box of money, gold, diamonds, papers and other valuables. Person 20 sent money to various people in various scams before she realized what was happening. Bank records show that, on August 9, 2018, Person 20 wired $55,500 to JPMC 5162, controlled by Ahiekpor.

    a. Bank records show that, after receiving the funds from Person 20 into JPMC 5162 and on or about the date set forth below, Ahiekpor engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

        i. August 10, 2018 - $41,575 wire to Company 6 in Ghana.

    b. Bank records also show that, after receiving the funds from Person 20 into JPMC 5162 and on or about the date set forth below, Ahiekpor engaged in the following financial transaction, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

        i. August 10, 2018 - $5,550 wire to Company 6 in Ghana.

42. According to an interview of Person 21 whose identity is known to the affiant, Person 21 met somebody she believed to be named Christian Mayer on an online dating website sometime around May of 2018. Mayer was supposedly from Florida but had gotten a job in London. Mayer eventually began asking Person 21 for money to pay for expenses related to a contract Mayer had secured. Bank records show that, on September 10, 2018, Person 21 wired $70,000 to JPMC 5162, controlled by Ahiekpor. Person 21 expected to be repaid, but she has not received any of her money back.

    a. Bank records show that, after receiving the funds from Person 21 into JPMC 5162 and on or about the date set forth below, Ahiekpor engaged in the following monetary transaction in criminally derived property of a value greater than $10,000:

        i. September 10, 2018 - $24,426 wire to Company 13 in Ghana.

43. Bank records also show that Person 18 deposited an additional $1,430 into JPMC 5162 on September 10, 2018, and Person 17 also deposited an additional $17,860 into JPMC 5162 on September 11, 2018.

    a. Bank records show that, after receiving the additional funds from Person 17 and Person 18 into JPMC 5162 and with some of the remaining funds from Person 21, on or about the dates set forth below, Ahiekpor engaged in the following monetary transaction, in criminally derived property of a value greater than $10,000:

        i. September 12, 2018 - $60,000 wire to a company in Canada.

44. According to an interview of Person 22 whose identity is known to the affiant, Person 22 met a man named James LNU a few years ago on an online dating website. James told Person 22 that he was on a ship working for MSC Shipping and needed money to buy out a contract. Person 22 sent money to various people at James' direction. Bank records show that, on October 1, 2018 and October 3, 2018, Person 22 wired $100,000 and $20,000, respectively, to BOA 4159, controlled by Ahiekpor. Person 22 later realized she was scammed.

    a. Bank records show that, after receiving the funds from Person 22 into BOA 4519 and on or about the dates set forth below, Ahiekpor engaged in the following monetary transactions, in criminally derived property of a value greater than $10,000:

        i. October 2, 2018 - $85,000 wire to a company in China;

        ii. October 4, 2018 - $17,000 wire to a company in Ghana.

45. Bank records show that, on October 10, 2018, an official check in the amount of $49,000 purchased by Person 23 was deposited into BOA 4519, controlled by Ahiekpor. As described in paragraph #33, Person 23 reported to the FBI that she was the victim of a scam in 2019.

    a. Bank records show that, after receiving the funds from Person 23 into BOA 4519 and on or about the date set forth below, Ahiekpor engaged in the following monetary transaction, in criminally derived property of a value greater than $10,000:

        i.  October 10, 2018 - $34,800 wire to Company 6 in Ghana.

    b.  Bank records also show that, after receiving the funds from Person 23 into BOA 4519 and on or about the date set forth below, Ahiekpor engaged in the following financial transaction, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

        i.  October 10, 2018 - $5,050 wire to Company 13 in Ghana.

46. Bank records show that Person 21 also deposited $15,000 cash into BOA 4519, controlled by Ahiekpor, on October 12, 2018. As described in paragraph # 40, Person 21 was instructed to send money to pay for expenses incurred by somebody she believed to be named Christian Mayer.

    a.  Bank records show that, after receiving the funds from Person 21 into BOA 4519 and on or about the date set forth below, Ahiekpor engaged in the following financial transaction, among others, involving the proceeds of wire fraud to conceal or disguise the nature, location, source, ownership, or control of the proceeds:

        i.  October 12, 2018 - $2,235 wire to Company 13 in Ghana;

47. According to an interview of Person 24 whose identity is known to the affiant, Person 24 stated that she met somebody she believed to be named Dominik Frei via a social media application. Frei told Person 24 that he owned a company that fixed oil rigs, and he was doing work on a rig off the coast of Liverpool, England. Frei eventually asked Person 24 for money to assist in buying equipment necessary to fix the rig, and Person 24 sent money to various people at Frei's request. Bank records show that, on November 5, 2018, an official check in the amount of $195,000 purchased by Person 24 was deposited into BOA 4519, controlled by Ahiekpor. Person 24 expected to be repaid, but her money has not been returned to her.

48. Person 25 provided information to FBI agents indicating that he was a victim of various Ghanaian scammers. The FBI agents relayed the information to me. Bank records show that, on November 18, 2018, Person 25 wired $64,000 to BOA 4519, controlled by Ahiekpor.

    a.  Bank record show that, after receiving the funds from Person 24 and Person 25 into BOA 4519 and on or about the dates set forth below, Ahiekpor engaged in the following monetary transactions, in criminally

derived property of a value greater than $10,000:

    i.   November 13, 2018 - $54,355 wire to a company in China;

    ii.   November 13, 2018 - $59,955 wire to a company in Ghana;

    iii.   November 16, 2018 - A check in the amount of $20,925 payable to Company 9;

    iv.   November 27, 2018 – A check in the amount of $105,750 payable to Company 11.

**Asante's Girlfriend**

49. When he was arrested on March 4, 2020, Asante asked permission to call his girlfriend to take custody of his child and his vehicle. Asante's girlfriend arrived on the scene and was identified. Ohio Secretary of State records show that Asante's girlfriend established Company 7 in September of 2018. Bank records show that Asante's girlfriend received funds characteristic of derivation from romance fraud totaling almost $550,000 between October of 2018 and August of 2019. The funds Asante's girlfriend received included $275,000 from Person 23. As described in paragraphs #33 and #43, Person 23 also sent funds to Yeboah and Ahiekpor. After receiving the funds, Asante's girlfriend wired a portion of the funds to a company to which Yeboah had also wired funds in October of 2018. Asante's girlfriend also received money from and/or sent money to JPMC 5930 and US 3133, both controlled by Yeboah.

## Use of Electronic Devices

50. I contend that Ahiekpor, Asante, Yeboah and others use various electronic devices to communicate with each other and other co-conspirators regarding and in facilitation of the fraud schemes and money laundering activities. This contention is based upon witness statements through which I learned that the victims in this investigation communicated with the perpetrators via email, instant messaging services, text messaging and phone calls. These forms of communication are often accessed through electronic devices, including cell phones. At least one victim stated that she had communicated with Asante directly using these media. This contention is further based upon additional investigative experience and other specific information obtained during the investigation, including the information in the following sections.

**Pen Register and Trap and Trace**

51. Between September 20, 2019 and November 14, 2019, IRS-CI placed Pen Register and Trap and Trace devices on various WhatsApp phone numbers, including 419-944-9903, associated with Ahiekpor.

52. I know from investigative experience that WhatsApp is a smart phone application which can also be accessed via a computer. WhatsApp is a free instant messaging and voice over internet protocol service. The user of the application downloads the application to their phone and/or computer, and the application requires the user to assign a phone number to the application. After a phone number is assigned to the application, the application sends a verification text to the phone number assigned. In this way, the application is linked to the phone number of the phone onto which the application was downloaded.

53. I also know that smart phone applications such as WhatsApp are often installed on the phones of the perpetrators of fraud schemes such as this. This application is used by persons engaged in fraud to communicate with individuals while potentially disguising their true identities. These communications can include communications with co-conspirators as well as victims.

54. The Pen Registers and Traps and Traces revealed that 419-944-9903 was active throughout the time period. It further revealed that Ahiekpor was in frequent communication with numbers known to be associated with Asante and Yeboah as well as numerous phone numbers based in Ghana throughout the monitored time period. Communications sent and received by Ahiekpor included text messages, audio files, video files and image files.

55. The Pen Registers and Traps and Traces revealed that the phone being used by Ahiekpor to send outgoing messages via WhatsApp was an Android phone.

**Conspirator 1, Conspirator 5 and Conspirator 9**

56. From at least April of 2012 through February of 2018, Conspirator 9 and others engaged in a conspiracy to commit money laundering in that they knowingly and willfully facilitated the receipt and transfer of funds derived from so-called "Romance Scam" victims. On February 14, 2018, Conspirator 9 was arrested following the filing of a criminal complaint related to this activity. On March 1, 2018, a grand jury returned an indictment charging Conspirator 9 and others with numerous counts in violation of money laundering statutes. Conspirator 9 has since pled guilty to violations of 18 USC 1956(h) and is currently serving a prison sentence.

57. When Conspirator 9 was arrested on February 14, 2018, his iPhone was seized and subsequently searched pursuant to a search warrant. The search of the phone revealed that Conspirator 9 was involved in two separate communication strings via the communication application WhatsApp with Conspirator 5 in Ghana and somebody later identified by Conspirator 9 to be Conspirator 1.

58. In the WhatsApp exchanges found on Conspirator 9's phone, Conspirator 5 and Conspirator 9 engage in communications, and sometimes Conspirator 9 relays the content of these discussions to Conspirator 1.

59. Bank records show that Conspirator 1 controlled a JP Morgan Chase Bank account (JPMC Account A) between at least the time period June of 2016 and February of 2018. Bank records further show that the account received over $1,131,000 in funds from several people in the United States and Canada during this time period. Notes related to incoming wires include such memoranda as "Payment for Holiday," "Purchase Property," "Other Investment," and "Goods." I interviewed nine of the individuals from whom Conspirator 1 received funds totaling over $864,000, including Person 8 who wired $29,000 to JPMC Account A on or about January 22, 2018. The statements they made regarding the nature of the money provided to Conspirator 1 was similar to the information provided by the individuals described previously in this affidavit and who provided funds to Asante and Yeboah. The deposits comprising the remaining approximately $450,000 were also characteristic of derivation from romance fraud.

60. Bank records show that, after receiving the funds from those nine people, as well as others, Conspirator 1 disposed of the funds largely through cash withdrawals; domestic and international wires/transfers; and purchases of official checks. This is similar to the activity in which Asante and Yeboah engaged after receiving funds into the bank accounts they controlled.

61. Comparison of activity in JPMC Account A to the WhatsApp conversations revealed that the discussions between Conspirator 5 and Conspirator 9 and subsequent relays of these conversations from Conspirator 9 to Conspirator 1 correspond to transactions occurring in JPMC Account A. Some of these conversations include the following:

> a. On January 22, 2018, Conspirator 5 sent Conspirator 9 a message containing an attachment. The attachment was a screenshot of a wire transfer from Person 8 to JPMC Account A in the amount of $29,000. Bank records show that Person 8 sent a $29,000 wire to JPMC Account A on or about January 22, 2018.

> b. On January 22, 2018, Conspirator 5 sent Conspirator 9 a communication with the information "Bank of America; New York, NY 10017; (Conspirator

24

2); $7700." JPMC Account A records show that on January 22, 2018, $7700 was wired from JPMC Account A to Conspirator 2.

c. On January 22, 2018, Conspirator 5 sent Conspirator 9 a communication with the information "Bank of America; (Conspirator 3); $8600." JPMC Account A records show that on January 24, 2018, $8600 was wired from JPMC Account A to Conspirator 3.

d. On January 23, 2018 at 1:37AM UTC, Conspirator 5 sent Conspirator 9 a communication with the information "Bank of America; Name on Account: (Conspirator 4)." The communication also contained an address, account number and routing number. On January 23, 2018 at 11:49AM UTC, Conspirator 9 sent Conspirator 1 a communication with the same information. Bank records show that on January 23, 2018, $10,000 was wired from JPMC Account A to Conspirator 4.

e. On January 23, 2018 at 12:28PM UTC, Conspirator 5 sent Conspirator 9 a communication with the information "(Company 1); 7385 chase (sic)." The communication also contained an account number. On January 23, 2018 at 1:19PM UTC, Conspirator 9 sent Conspirator 1 a communication with the same information. Bank records show that on January 23, 2018, a check was issued from JPMC Account A to Company 1 in the amount of $7385.

f. On January 23, 2018, Conspirator 5 sent Conspirator 9 a message containing an image of bank information for Company 3 in China. This is the same Company 3 to which Yeboah sent wires in December of 2017 and January and February of 2018. Conspirator 5 followed that message with two additional messages stating "Any amount can go" and "$30K and above."

g. On January 26, 2018, Conspirator 1 sent Conspirator 9 a message containing an image of a wire transfer confirmation in the amount of $30,000 from JPMC Account A to Company 3. Bank records show that a wire in the amount of $30,000 was sent from JPMC Account A to Company 3 on or about January 26, 2018.

h. On February 5, 2018, Conspirator 5 sent Conspirator 9 a message with an attachment showing bank account information for Company 4 in China followed later by a message stating "50 k for China." This is the same Company 4 to which Yeboah sent a $70,000 wire on December 7, 2017.

i.   On February 5, 2018, Conspirator 9 sent Conspirator 1 a message stating "I need u to do China ooo" followed by a message stating "50" and a third message containing the same image that Conspirator 9 had received from Conspirator 5 with the information related to Company 4.

j.   On February 5, 2018, Conspirator 1 sent Conspirator 9 a message containing an image of a wire confirmation showing that he had wired $50,000 from JPMC Account A to Company 4. Bank records show that a wire in the amount of $50,000 was sent from JPMC Account A to Company 4 on or about February 5, 2018.

k.   On February 5, 2018, Conspirator 9 sent Conspirator 5 a message containing an image of a screen grab showing that JPMC Account A had wired $50,000 to Company 4.

62. Conspirator 9's iPhone also contained a WhatsApp conversation between Conspirator 9 and phone number later determined to belong to Asante.

63. Conspirator 9 told investigators that Conspirator 5 defrauds people throughout the world and receives money into numerous accounts he controls. Conspirator 9 told investigators that Conspirator 5 often sent him messages regarding fraudulent financial transactions involving Conspirator 1 and/or Asante. Conspirator 9 stated that he would routinely relay information from Conspirator 5 to Conspirator 1 and/or Asante with respect to the transactions. Conspirator 9 stated that Conspirator 1 and Asante knew that the money being sent to their accounts was "bad money."

64. Conspirator 9 also told investigators that Asante brought Yeboah into the activity described in this affidavit. Conspirator 9 knows this because Asante told him that he had Yeboah transfer money for him.

**Searches of Asante's Phones**

65. On March 3, 2020, the affiant applied for and was granted an arrest warrant for Asante based on a Criminal Complaint alleging that Asante was engaged in a money laundering conspiracy in violation of 18 USC 1956(h). On March 4, 2020, agents with IRS-CI asked for and received assistance from the Columbus Police Department in conducting a traffic stop in order to arrest Asante. Asante was arrested while driving a black Mercedes, license plate MBAT41. When he was arrested, Asante was in possession of a white iPhone and a gold iPhone.

66. On March 9, 2020, the affiant applied for and was granted search warrants related to Asante's white and gold iPhones. The searches revealed that Asante engaged in numerous conversations via WhatsApp with individuals during which time he discussed fraudulent activities. Some of these conversations included, but were not limited to, the following:

> a. On April 8, 2016, Asante engaged in a conversation with somebody named "Godwin." Godwin stated, "They involving FBI to come check money locked in ur account!" Asante replied, "FBI will go to de bank n see if any money is locked in der which der won't be no money in so trust me..de system here don work like dat if it was deposit n moreover dat woman don know me n I don know her so let dem go ahead n do wat dey wan to do cos I have never spoken to dis woman before n nun shows my IP address so we all should think twice n make a wise decision cos it's not gonna be a one person in trouble."

> b. On September 2, 2016, Asante engaged in a conversation with somebody named Ohemaa Pokuaah. Ohemaa Pokuaah sent Asante a message saying, "And pls the client is in Ohio ooo." Asante responded, "Really...is dat ok." Ohemaa Pokuaah responded, "Yes bro...Am cool your side?" Asante replied, "I mean since de client is in Ohio..u think it's safe." Ohemaa Pokuaah replied, "No bro...get another state let's work it out pls."

> c. On September 14, 2017, Asante engaged in a conversation with Conspirator 9. In the conversation, Asante and Conspirator 9 discussed a $5,300 deposit to be made into JPMC xx1215, controlled by Asante. Asante asked whether it was $5,300 or $53,000. Conspirator 9 responded that it was $5,300, and Asante responded "Lol." Conspirator 9 then stated, "Yea...The big one he hasn't done it...He just forward me this...U know how new clients pay small first." Asante responded, "Yea." Bank records show that JPMC xx1215 received a $5,300 wire on September 21, 2017 from an individual in Canada.

67. The searches of the iPhones also revealed that Asante possessed numerous photos and recordings on his phones. Many of the photos and recordings were related to banking activities in which Ahiekpor was involved. Some of these items and the associated bank records are described below:

> a. Asante possessed at least nine photos showing somebody holding an Android phone which had accessed JPMC xx5162, controlled by Ahiekpor, using a mobile application. The photos showed account activity in JPMC xx5162. One of the photos was of a confirmation of a $60,000

wire sent from JPMC xx5162 to a company in Toronto. Bank records show that the $60,000 wire occurred two days after funds totaling $89,290 were received into JPMC xx5162 from Person 17, Person 18 and Person 21.

b. Asante possessed at least three photos showing account activity in BOA xx4519, controlled by Ahiekpor. One of the photos was of a computer screen showing a confirmation of a $17,000 transfer from BOA xx4519 to a company in Ghana. Bank records show that the $17,000 transfer out of BOA xx4519 was sent one day after a wire into BOA xx4519 from Person 22 in the amount of $20,000.

c. Asante possessed a recording of a call between an individual who identified himself as Ahiekpor and a customer service representative from Wells Fargo Bank. Ahiekpor and the customer service representative discussed Ahiekpor's account. The customer service representative explained to Ahiekpor that his account was to be closed the following day.

   i. Asante possessed a screenshot of a text conversation involving someone identified as "Eric Premier." Asante's phone contacts show that the phone number assigned to "Eric Premier" is 419-944-9903. As stated previously, this number is associated with Ahiekpor. In the conversation, Ahiekpor stated, "Tried to do wire…Said account wasn't eligible." Ahiekpor then sent Asante an image of an email from Wells Fargo informing Ahiekpor that a hold had been placed on the account ending xx2902. Ahiekpor later sent a message to Asante stating, "Funds will be available 9/13/2018."

   ii. Bank records show that on September 4, 2018, an official check in the amount of $40,000 from an individual in Mississippi was deposited into the Wells Fargo account ending xx2902. Bank records also show that on September 13, 2018, Ahiekpor transferred $39,000 to Wells Fargo account ending xx7584, another account he controlled. These funds were later provided to Ahiekpor when Wells Fargo closed both accounts.

d. Asante possessed a screenshot of a text message conversation involving "Eric Premier." In the conversation, Asante stated, "Boss can u check ur chase account n lemme know…Big payment is coming." Ahiekpor stated, "Nothing."

e. Asante possessed a screenshot of a text message conversation involving "Eric Premier." In the conversation, Asante stated, "Check our convo cos dey wanna make another payment... We need to make money oooo." Ahiekpor stated, "Ok bro... I dey get ready to go the bank."

f. Asante possessed a screenshot of a text message conversation involving "Eric Premier." In the conversation, Asante says, "Boss I need di $3k so send mine to my KeyBank cos dey paying 2 big ones today." Ahiekpor responds, "Ok."

## Technical Background

68. I have consulted with IRS-CI Special Agent-Computer Investigative Specialist Dennis Nutt regarding the aspects of properly retrieving and analyzing electronically stored computer data. Special Agent Nutt has been employed with IRS-CI since 1988. In addition to attending training in financial investigation techniques and accounting, he has also completed the IRS-CI Basic Computer Evidence Recovery Training class at the Federal Law Enforcement Training Center in Glynco, Georgia, (2006), the Advanced Computer Evidence Recovery Training class at the CyberCrimes Center in Fairfax, Virginia (2007, 2012, 2016, and 2018), Macintosh Forensics Training in Glynco, Georgia (2016), and Basic Computer Forensics Examiner Training – International Association of Computer Investigative Specialists in Orlando, Florida (2018) where he learned about the operation of computer systems and the correct procedures for seizure and analysis of computer systems. Special Agent Nutt has also completed the Mobile Device Forensics Training in Glynco, Georgia (2014) and the Advanced Mobile Device Forensics Training in Glynco, Georgia (2016) where he learned about the operation of mobile devices and the correct procedures for seizing and analyzing those devices.

69. During the last 14 years Special Agent Nutt has participated in scores of search warrants during which he has seized numerous computers and has been responsible for analyzing seized electronic data and records from those systems.

70. Based upon the affiant's consultation with Special Agent Nutt, the affiant knows that searching and seizing information from computers and cell phones often requires agents to seize most or all electronic storage devices to be imaged and searched later by a qualified computer specialist in a laboratory or other controlled environment. This requirement is due to the following:

a. Technical requirements: Images or backups of computer data need to be restored to a separate computer and verified to ensure that the files

restore or copy properly. Additionally, evidence may be encrypted, password protected, or may be in a format that could result in evidence being overwritten and/or destroyed electronically should an attempt be made to examine the electronic evidence on site.

b. The volume and nature of electronic evidence: A seemingly small media storage device can store the equivalent of thousands of pages of information or more. It may be impractical to attempt data analysis on site.

c. The terms "records", "documents", and "materials" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including, but not limited to any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any electrical or magnetic form (such as tape recording, cassettes, compact disks); and/or any information on an electronic, digital, or magnetic storage device (such as floppy diskettes, hard drives, USB drives, backup media, disk cartridges, CD-ROMs, DVDs, optical disks, smart cards, cell phones, tablets, or electronic notebooks); as well as printouts or readouts from any magnetic storage device.

## Conclusion

71. Based on the information presented in this affidavit, I contend that Ahiekpor, Asante, Yeboah and others were engaged in a conspiracy to commit money laundering in violation of 18 USC 1956(h). I further contend that Ahiekpor, Asante, Yeboah and others each personally committed multiple acts in violation of 18 USC 1956(a)(1)(B)(i); 18 USC(a)(2)(B)(i); and/or 18 USC 1957 in furtherance of the conspiracy. I further believe that Ahiekpor, Asante, Yeboah, and others used various electronic devices to communicate regarding and to facilitate the laundering of funds derived from fraud schemes, and evidence of these violations, as well as violations of 18 USC 1343, is now located in the items described in Attachment A. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Shawn A. Mincks
Special Agent, IRS-CI

Subscribed and sworn to before me

This _____25th_____ day of _____June_____ , __2020__ .

Kimberly A. Jolson
United States Magistrate Judge

31